UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AUDRY WAYNE LAW,

Petitioner,

v.

E. BORLA,

Respondent.

Case No. 23-cv-01727-EKL

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, DENYING MOTIONS TO SUPPLEMENT RECORD, AND PARTIALLY GRANTING CERTIFICATE OF APPEALABILITY**

Re: ECF Nos. 28, 31, 32

Petitioner Audry Wayne Law, a *pro se* state prisoner, filed a petition for writ of habeas corpus on April 11, 2023. *See* ECF No. 1. The Court (Martinez-Olguin, J.) issued an order to show cause, and Respondent filed an answer. *See* ECF Nos. 11, 16. Petitioner filed a traverse. ECF No. 21. Petitioner also filed several motions to supplement the record, which are pending before the Court. *See* ECF Nos. 28, 31, 32. Respondent filed an opposition to the motions. *See* ECF No. 30. For the reasons set forth below, the Court DENIES the petition for habeas relief and pending motions to supplement the record. In addition, the Court partially GRANTS a certificate of appealability.

I.      **BACKGROUND**

A.      **Evidence at Trial**

As detailed in the California Court of Appeal's opinion on direct appeal, Petitioner "Audry Wayne Law killed Phong Huu 'Peter' Nguyen by multiple blows to the head with a rock and possibly a brick." *People v. Law*, No. H047356, 2022 WL 3210088, *1 (Cal. Ct. App. Aug. 9, 2022). "A jury acquitted Law of first degree murder but rejected his claim of self-defense, convicting him of second degree murder." *Id.*

The evidence at trial showed the following. On July 12, 2016, Hoang Thi Ho, an acquaintance of both Petitioner and Nguyen, drove by Petitioner's home while she was searching for Nguyen. *Law*, 2022 WL 3210088, at *1. Nguyen had not answered Ho's phone calls. *Id.* Ho saw Nguyen's car parked in Petitioner's driveway, called Petitioner, and offered to bring crack so they could "'hang out.'" *Id*. When Ho returned to Petitioner's home with crack, she spoke to Petitioner in his driveway and "noticed a 'chunk' of blood – and 'not, like, fresh color blood' – on [Petitioner's] face." *Id*. Ho asked Petitioner about Nguyen's whereabouts, but Petitioner told her that Nguyen had left. *Id.* Ho left the premises but returned a few minutes later and asked if she could come inside the home to smoke with Petitioner, who acquiesced to her request. *Id.* By the time Ho asked to enter the home, Petitioner had cleaned the blood off his face. Another acquaintance, "Chau," was in Petitioner's bathroom when Ho went inside the house. *Id*. Chau later exited the bathroom holding Nguyen's phone, which had been taken apart and was wet. Ho attempted to fix the phone but was unable to do so. *Id*. Ho became afraid and left the home "on the pretense that she was going to get some beer." *Id*.

> Early the next morning, [Petitioner] called the police. At around 3:00 a.m., officers responded to [Petitioner]'s house. [Petitioner] directed them to the side yard, behind a closed gate, where they found Nguyen's body between [Petitioner]'s house and a fence. There was "lots of blood" near Nguyen's body in the side yard. Bloodstains continued past Nguyen's body in the direction of the gate, closer to the front of the house than where Nguyen's body lay. There were what appeared to be bloody finger marks on the inside of the side gate leading to the front yard. A bloody rock and a bloody brick were in a white trash can in the backyard. There was very little garbage in [Petitioner]'s house, leading the police to suspect that evidence had been removed. There were damp towels, shoes, and clothes in a washing machine in the laundry room, some of which appeared to have bloodstains. There was a bloody towel in the kitchen.

> In a recorded conversation at the scene, [Petitioner] told police that he and Nguyen had been drinking bourbon together before they decided to go outside and smoke cigarettes. [Petitioner] said that he and Nguyen got into an argument and that Nguyen "went off," attacking him from behind while [Petitioner] was at the side gate. [Petitioner] hit Nguyen back, Nguyen hit [Petitioner] with a brick or a rock, the two men struggled on the ground, and [Petitioner] hit Nguyen with another rock. [Petitioner] ran back into his house because he was afraid that he would end up "being locked up for something [when] I was just trying to protect myself." [Petitioner] said his struggle with Nguyen occurred at about 7:00 p.m. on July 12. [Petitioner] had ten injuries, most of which were scratches and

2

abrasions on his body, knees, legs, arms, and fingers. In one officer's opinion, the injuries to [Petitioner]'s legs appeared "old," but an injury to [Petitioner]'s right middle finger was fresh. [Petitioner] also had a slight bump on the back of his head.

In further interviews on July 13 and July 15, [Petitioner] recounted that he had done "a line or so" of cocaine earlier the day of the killing. In the late morning, a woman named Tau or Chau brought a bottle of bourbon to [Petitioner]'s house, and they drank shots of bourbon together. Some time after the woman left, Nguyen came to visit. At around 7:00 p.m., they headed to the backyard, Nguyen following [Petitioner] to the side gate. Perhaps because of something [Petitioner] said, Nguyen struck [Petitioner] in the back of the head. Nguyen struck [Petitioner] a second time as [Petitioner] turned to face him. At that point, [Petitioner] either "just laid right into [Nguyen,]" or, at least, "took a swipe at" Nguyen. Nguyen may have thrown a brick, one of many in the backyard, or a rock at [Petitioner] from close range, either missing [Petitioner] or hitting him in the leg. By this time, [Petitioner] was "really, really, really pissed . . . off." The two men struggled on the ground, and when [Petitioner] managed to get on top, he grabbed a nearby rock and struck Nguyen three times in the head and face. [Petitioner] saw blood coming from the top of Nguyen's head, so he "took off and ran." Although [Petitioner] did not believe Nguyen was dead at that point, [Petitioner] feared seeking medical assistance would get him in trouble. [Petitioner] stated that nobody came to his house at any point after his fight with Nguyen and before the police arrived.

[Petitioner] was initially adamant that the gate was locked and that neither he nor Nguyen touched it. Told that there was blood on the gate, [Petitioner] said that the blood probably came from his own hand, then said he was "more than 100 percent sure" that he touched the gate and opened it when he had blood on his hand, flowing from his cut finger. [Petitioner] said that Nguyen never touched the gate and that there was "no way" the blood was Nguyen's.

While he was being interviewed, [Petitioner] told investigators that he feared for his life while he was fighting Nguyen. [Petitioner] allowed that he "maybe" or "in a sense kind of" feared for his life when he was hitting Nguyen with the rock: although Nguyen "was still fighting," [Petitioner] "was on top" by that point.

> [n.1: Nguyen was a 66-year-old man who, at the time of the autopsy, measured 5 feet 5 inches tall and 112 pounds. [Petitioner] was 60, 5 feet 7 inches tall and 155 pounds.] In that vein, [Petitioner] related a prior incident in which a Vietnamese man had threatened him with a gun at his house. A detective pulled the police report from the prior incident and determined that it had no connection to [Petitioner]'s fight with Nguyen.]

Dr. Michelle Jorden, the chief medical examiner for Santa Clara County Medical Examiner-Coroner's Office, performed the autopsy of Nguyen. Testifying as an expert in the cause and manner of death, Jorden opined that the cause of Nguyen's death was "skull and brain injuries, due to multiple blunt head trauma." The presence of blood

3

in his stomach and airway from his multiple facial fractures suggested that Nguyen remained "alive for a period of time" after the assault and "was choking on his own blood." But because his head injuries were "so massive and devastating," Jorden concluded that these alone would have been fatal. Jorden documented a total of 42 "injuries" on Nguyen's body, including seventeen "blunt force injuries" on Nguyen's head. Nguyen's injuries included skull fractures on the left side of his head, brain lacerations – "actual[] tearing of the brain tissue itself" – and facial fractures. He also had a displaced fracture in his left arm, two rib fractures (one on each side of his chest), and bruising on the back of his hands. Asked if each of the 42 "blunt force traumas" signified "separate blows," Jorden replied, "Not necessarily," and allowed that a "single impact can cause multiple injuries." Jorden was unable to say how many blows Nguyen received.

According to Kristin Dougherty, a forensic biologist with the Santa Clara County District Attorney's Office Crime Laboratory, Nguyen was the source of the DNA in a red-brown stained swab taken from the gate, in the samples from the bloodstained rock and the bloodstained brick, in the red-brown stain on the kitchen towel, and in several other apparent bloodstains in and around the side yard. Nguyen was a possible DNA contributor to a red-brown stain on a shoe recovered from the laundry machine. [Petitioner] was a possible minor contributor of DNA on the rock and brick, and the stained kitchen towel.

Cordelia Willis, an expert in "bloodstain pattern analysis and crime scene reconstruction" with the Santa Clara County District Attorney Crime Laboratory, did not personally examine the crime scene or Nguyen's body but relied on the police reports, photos of the crime scene, photos of [Petitioner], Dougherty's DNA analysis, and Jorden's autopsy report.

Willis opined that the presence of vertical droplets of Nguyen's blood past the side gate indicated the presence of either Nguyen or an object dripping Nguyen's blood on the front-yard side of the gate. Further, Willis opined that during the altercation Nguyen was on or near the ground and blood was coming from his airways, possibly because he was coughing it up, snorting it out, or because it was being knocked out of him. Willis believed that the fracture to Nguyen's left arm occurred as he tried to protect his already-bleeding face: there was a substantial amount of blood on his left sleeve that could only have originated from his head. Some of the bloodstains on the fence appeared "chunky," possibly due to the presence of brain matter that flew off as [Petitioner] swung the rock or the brick. Willis opined that the brick and the rock had dried before being moved to the trash can, because there were transfer stains on the ground but none in the trash can. Willis stated that a series of bloodstains on the wall appeared to be handprints: these were consistent with either a hand or bloody object had been wiped on the wall, or with a person pressing a bloody hand against the wall for support.

At trial, the parties stipulated that: (1) A blood sample taken from [Petitioner] at 3:15 a.m. on July 13 tested positive for cocaine; (2) A blood sample taken from Nguyen at 3:37 p.m. on July 13 tested

positive for cocaine; and (3) one type of particle from Nguyen's brain was optically and chemically indistinguishable from particles found in a surface sample of the brick and another type of particle from Nguyen's brain was optically and chemically indistinguishable from a surface sample of the rock.

*Law*, 2022 WL 3210088, at *1-3.

### B.    Habeas Exhibits

Petitioner attached his California Supreme Court petition for review as an exhibit to his federal petition. *See* ECF No. 1-1. Respondent filed several exhibits with his answer, including the Clerk's and Reporter's Transcripts, appellate briefing, the California Court of Appeal's appellate opinion, and the petition for review filed in the California Supreme Court, along with that court's subsequent denial. ECF Nos. 17, 18.

### C.    Petitioner's Proposed Supplemental Exhibits

In his pending motions to supplement his habeas petition, Petitioner provides copies of various items. First, he provides a copy of a report by an investigator for the Alternate Defender's Office detailing an interview of an individual named "Calvin" Pham. ECF No. 28-1 at 15-18. Per the report, Pham recounted an altercation he had with Petitioner that resulted in Pham's arrest and jailing for possession of a gun. *Id.* In the report, Pham told the investigator that Petitioner was outside his home when Pham arrived on the date of the dispute. Next to this paragraph is a handwritten note stating: "False Statement[,] I [Petitioner] was inside my house when he [Pham] knock[ed] on my door. My niece answered the door, that someone was looking for me . . . ." *Id.* at 15. Petitioner also provides a copy of a habeas petition filed in Santa Clara County Superior Court raising claims that the prosecutor committed misconduct and violated his due process rights by misstating CALCRIM 371, mischaracterizing material evidence, and shifting the burden of proof to the defense to produce evidence that he was attacked outside his home by an individual with a firearm. *Id.* at 21.

In addition, Petitioner provides copies of other motions and habeas petitions filed in Santa Clara County Superior Court, as well as the Superior Court order denying his claims. *See* ECF Nos. 31, 32. The Superior Court denied habeas relief on the basis that the claims were procedurally barred because either they were raised by Petitioner on his direct appeal and rejected

by the California Court of Appeal, or they could have been raised on appeal, but were not.  The Superior Court further found that, in any event, the Alternate Defender's Office report was not presented to the jury and, thus, the jury would not have seen any alleged false statements by Pham in the report.  ECF No. 31 at 8-11.

## II.    LEGAL STANDARDS

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal district courts may entertain a petition for writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (discussing 28 U.S.C. § 2254(d)(1)).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  A federal habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable," *id.* at 409, and "may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly," *id.* at 411.

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the district court looks to the last reasoned opinion of the highest court to analyze whether

the state judgment was erroneous under the standard of § 2254(d). *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). In this case, the California Court of Appeal is the highest court to issue a reasoned decision on Petitioner's claims.

### III.     ANALYSIS

Petitioner raises several claims, including that (1) prosecutorial misconduct during closing arguments violated his right to due process, (2) the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose evidence of expert witness Jorden's pro-prosecution bias, and (3) cumulative errors prejudiced Petitioner's defense that he acted in self-defense. The Court addresses each claim in turn.

#### A.     Prosecutorial Misconduct

Petitioner argues that the prosecutor committed misconduct during closing argument by mischaracterizing the evidence, invoking facts not in evidence, misstating the law, and attempting to shift the burden of proof to the defense. *See* ECF No. 1 at 23.

Prosecutorial misconduct states a cognizable federal habeas claim where a prosecutor's misconduct violates the Due Process Clause. *Darden v. Wainwright,* 477 U.S. 168, 181 (1986). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Id.*; *see Smith v. Phillips,* 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."). A prosecutorial misconduct claim is decided "on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (citation modified); *see Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial."). In other words, the prosecutorial misconduct must have had a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States,* 328 U.S. 750, 776 (1946); *see Johnson v. Sublett,* 63 F.3d 926, 930 (9th Cir. 1995) (citing *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993)).

The Court addresses each alleged instance of misconduct below.

United States District Court
Northern District of California

### 1.     Blood Evidence

Petitioner argues that the prosecutor mischaracterized the evidence during closing argument by stating that the blood on both sides of Petitioner's back gate showed that Nguyen attempted to escape from Petitioner's backyard shortly before his death, and that the bloody handprints on the wall were Petitioner's "mark of a victor."  ECF No. 1 at 24.

### a.     State Court Opinion

In denying the claim on appeal, the California Court of Appeal noted:

> The prosecutor exhorted the jury to interpret the presence of [Nguyen's] blood on both sides of the side gate and on a wall as supporting his ultimately unsuccessful theory of first degree murder. In the prosecutor's telling, the presence of blood on both the front and back of the side gate signified that Nguyen, "as he was beaten and bloodied, . . . tried to escape" through the gate, leaving what the prosecutor opined were bloody finger marks, only to have [Petitioner] "drag[] him back" into the yard to beat him "in different locations until he was beaten to death [in a] separate place than where he was [first] dragged down to the ground."  In a similar vein, the prosecutor argued that bloodstains on a wall at the scene signified that [Petitioner] had wiped Nguyen's blood there as "the mark of a victor." Petitioner contends that these arguments amounted to misconduct because the testimony of Willis, the crime-scene reconstructionist, belied the prosecution theory.  For the reasons that follow, we conclude that the prosecutor's comments regarding the blood on the gate and wall were permissible based on the evidence that was introduced at trial.
>
> As to Nguyen's alleged attempted escape, [Petitioner] concedes that the prosecution could reasonably have inferred that Nguyen "might have been outside the gate at some point during the fight" due to evidence of blood droplets outside the gate that "could have been deposited directly by Nguyen or have dripped from a bloody object," but argues that "it was pure speculation for the prosecutor to assert that Nguyen had 'tried to escape' before [Petitioner] 'dragged [him] back' to the spot where his body was found."  Willis had opined that either Nguyen or an object bearing a large quantity of his blood had left the blood on each side of the gate.  Indeed, given [Petitioner]'s initial denial that [he] ever opened the gate, the prosecution's theory that Nguyen had opened the gate in an effort to escape after [Petitioner] first drew blood cannot be characterized as so implausible as to be misleading.  The eventual location of Nguyen's body relative to the gate invited the further inference that Nguyen had not arrived there by choice but by [Petitioner]'s intervention.
>
> Contrary to [Petitioner]'s insistence, the mere absence of "drag marks" in the yard does not refute the inference that [Petitioner] could nonetheless have forced Nguyen to the spot where he died. [Petitioner] misreads Willis' testimony by claiming that "the only inference she could draw with any certainty from the location of the blood stains was that a physical altercation had taken place."  In the

cited excerpt of her testimony, Willis answered "yes" when defense counsel asked, "So *one* thing you can say for certain . . . is a physical altercation occurred in the side yard?" (Italics added.) Because defense counsel stopped short of asking if this were the "only" inference Willis could "say for certain," we decline to read a broader concession into this exchange than its plain terms support.

As for the prosecutor's argument about the blood found on the wall, the meaning of the prosecutor's "mark of a victor" formulation is somewhat opaque. We construe this claim to be, at a minimum, that [Petitioner] did not incidentally leave the bloodstain by using the wall for support but instead deliberately wiped his bloody hand on the wall. Willis testified that the bloodstains appeared to be a series of handprints and "finger swipes." On cross-examination, she further explained why she considered it more likely that [Petitioner] had been trying to wipe blood off his hands than merely leaving blood inadvertently as he used the wall for support, although she did not reject the latter possibility. Accordingly, the prosecutor's argument that [Petitioner] intentionally deposited Nguyen's blood on the wall was grounded firmly in the expert opinion evidence, even if the expert's opinion was subject to debate.

To the extent the prosecutor meant by his argument to convey that [Petitioner]'s intention in leaving the finger swipes was to "mark" his killing of Nguyen as a "victory" over a "vanquished foe," an attorney's entitlement to argue a person's intent based upon the person's acts and circumstances of the crime should not be seriously in question. To be sure, this particular inference, if intended, would appear to conflict with the prosecutor's theory that [Petitioner] concealed evidence by cleaning up the blood and laundering his clothing and towels. But [Petitioner] offers no authority for the proposition that logical inconsistency or overheated rhetoric of an argument amounts to misconduct.

Persuasive or not, the prosecutor's arguments neither obfuscated nor mischaracterized, even inadvertently, the nature of the underlying evidence. The prosecutor argued his theory of liability from circumstantial evidence susceptible of his preferred inferences and, like all circumstantial evidence, of alternative inferences. That his preferred theory at times required a succession of inferences from the known facts remains within the permissible scope of argument. In short, the prosecutor's argument was trial advocacy.

*Law*, 2022 WL 3210088, at *5-6 (citations omitted).

### b. Analysis of Federal Claim

Petitioner is not entitled to federal habeas relief for this claim because he has not shown that the California Court of Appeal's conclusion was objectively unreasonable. *See* 28 U.S.C. § 2254(d); *Darden,* 477 U.S. at 181. As noted, the prosecutor's argument and the inferences that he asked the jury to draw were proper. On appeal, Petitioner conceded that the blood outside of his back gate could be interpreted to show that Nguyen left and bled outside of Petitioner's

9

backyard, and it is undisputed that Nguyen's body was found inside Petitioner's backyard. *Law*, 2022 WL 3210088, at *5. The state appellate court's determination that the absence of drag marks on the floor "does not refute the inference that [Petitioner] could nonetheless have forced Nguyen to the spot where he died" is similarly reasonable based on the record. *Law*, 2022 WL 3210088, at *6. "[P]rosecuting attorneys . . . may strike hard blows based on evidence and reasonable inferences from the evidence [during closing argument]." *United States v. Vaccaro*, 816 F.2d 443, 451 (9th Cir. 1987) (attorneys given wide latitude in closing arguments and entitled to argue reasonable inferences from the evidence), *abrogated on other grounds by Huddleston v. United States*, 485 U.S. 681 (1988). And a review of the trial record shows that defense counsel argued vigorously against the prosecutor's interpretation of the evidence during closing. ECF No. 18-11 at 83-89.

Nor has Petitioner demonstrated that the appellate court's finding regarding the handprint on the wall was objectively unreasonable. *Law*, 2022 WL 3210088, at *6 (noting that the prosecution's argument that the handprint was a "mark of a victor" constituted permissible trial advocacy); 28 U.S.C. § 2254(d). Assuming that the prosecutor's "mark of a victor" comments – which the appellate court noted contradicted the prosecution's theory that Petitioner concealed evidence of the killing – constituted misconduct, Petitioner has not shown that the comments had a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos,* 328 U.S. at 776. As the California Court of Appeal noted, "[t]he express purpose of the prosecution's 'mark of a victor' argument was to demonstrate premeditation and deliberation in support of a first degree murder charge[, but the] jury acquitted [Petitioner] of first degree murder . . . [and convicted] him of second degree murder instead." *Law*, 2022 WL 3210088, at *7 n.4.

The state court's rejection of these claims was reasonable and is entitled to AEDPA deference. *See* 28 U.S.C. § 2254(d). These claims are therefore DENIED.

### 2.    42 Separate Blows

Petitioner argues that the prosecutor improperly mischaracterized evidence in the record by asserting multiple times that Petitioner "delivered '42 separate blows' to Nguyen's head and body" during closing argument. ECF No. 1 at 23. During closing argument, the prosecutor

United States District Court
Northern District of California

10

referenced "42 blows" twice, as follows:

- "[P]remeditation and deliberation.  That is what the evidence shows.  It wasn't, [']I hit him three times and I ran into the house and he was alive[.']  [N]o.  Victim was dead.  He delivered the fatal blow after 42 blows."  ECF No. 18-4 at 49.

- "Explain to me what world we live in that it's necessary to inflict 42 separate blows, crush a man's skull, break his arm and his two ribs . . . ."  *Id.* at 51.

### a.  State Court Opinion

The California Court of Appeal denied this claim of prosecutorial misconduct, finding that while "[t]he prosecutor's repeated claim in closing argument that [Petitioner] had struck Nguyen 42 times presents a closer question [as to prosecutorial misconduct], in that it conflicts with the testimony of his own medical examiner," *Law*, 2022 WL 3210088, at *6, any misconduct was harmless under the circumstances.

> The record reflects that the prosecutor was aware of the distinction between the number of blunt force traumas Nguyen experienced and the number of blows that [Petitioner] visited upon him.  On direct examination, the prosecutor's forbearance from pressing Jorden [an expert medical witness as to the cause and manner of death] for a more definitive answer suggests he anticipated the unfavorable answer which defense counsel was able to elicit from Jorden on cross-examination.  Although Jorden never expressly refuted the possibility that 42 blunt force traumas could have been inflicted by 42 separate blows, her broad definition of "blunt force trauma," her unambiguous concession that multiple such traumas could result from a single blow, and her unmistakable resistance to the prosecutor's attempt to equate the number of injuries and the number of blows combined to make the prosecutor's claim of "42 separate blows" sufficiently implausible that we are unable to deem this a reasonable inference from the evidence.  The prosecutor's commentary therefore went beyond a comment on reasonable inferences that could be drawn from the evidence.
>
> On the record as a whole, however, we do not discern "'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.'"  The trial court's instructions blunted the impact of the prosecutorial overreach.  Before closing arguments began, the court duly instructed the jury that although the attorneys would discuss the case in their closing arguments, "their remarks are not evidence."  More importantly, each time defense counsel objected to prosecutorial argument as misstating the evidence, the trial court reminded the jury that the statements of the lawyers are not evidence.  On the fourth such occasion, the trial court further admonished the jury:  "Please review and listen to the evidence yourself and make your own decisions."  Furthermore, the character of Jorden's testimony and her consistent resistance to quantifying the number of blows based on the number of traumas she

11

had catalogued would have made the unreasonableness of the prosecutor's comment on the evidence have been apparent to the jury, whose attention defense counsel called to the conflict between the prosecutor's characterization and Jorden's actual testimony.[3]

> [n.3:  In her own closing argument, defense counsel drew the distinction between Jorden's testimony that there were 42 injuries and the prosecutor's conclusion that there were 42 different blows:  "[T]he District Attorney keeps arguing over and over again that it was 42 different blows.  And that is not what Dr. Jorden said.  She described them as 42 injuries."  Defense counsel reminded the jury of Jorden's testimony on direct examination that the 42 injuries included those to Nguyen's hands, which could have been offensive wounds.  Defense counsel erroneously claimed that Jorden had included Nguyen's age-related skin lesions in the count.  As to the balance, defense counsel argued that "a series of lacerations [Jorden] describes in close proximity to the head" were consistent with Jorden's testimony "'that multiple injuries can result from a single blow from an uneven object like this rock in this case.'"]

Indeed, the jury's verdict of acquittal on first degree murder, despite the prosecutor's reliance on 42 distinct blows as reflecting premeditation and deliberation, suggests that the jury was as unimpressed by the prosecutor's interpretation of Jorden's actual testimony as by his interpretation of the blood evidence.

*Id.* at *7 (citations omitted).

### b.      Analysis of Federal Claim

Petitioner has not shown he is entitled to federal habeas relief for this claim.  In determining whether prosecutorial misconduct resulted in actual prejudice, a trial court's issuance of a curative instruction is considered a significant factor, and a federal habeas court "presume[s] jurors follow[ed] the court's instructions absent extraordinary circumstances."  *Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005).  A district court must generally "presume that a jury will follow an instruction . . . unless there is an overwhelming probability that the jury [was] unable to [do so], and a strong likelihood that the effect of the [objectionable statements or] evidence was devastating to the defendant."  *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (citation modified).

Based on the evidence in the record, the California Court of Appeal reasonably concluded that the prosecutor's repeated statements that Nguyen's injuries were the result of 42 distinct blows amounted to misconduct but were ultimately harmless.  Specifically, the trial court instructed the jury that attorney's "remarks are not evidence" before closing arguments began and

United States District Court
Northern District of California

instructed the jury to review the evidence and make its own determination after defense counsel objected to the prosecutor's challenged statements. *Law*, 2022 WL 3210088, at \*7; *see also Bynum v. Curry*, No. 09-cv-02326 JSW, 2013 WL 1164800, \*19 (N.D. Cal. Mar. 20, 2013) (finding state court reasonably concluded that any improper comments by prosecutor were cured by similar instruction). Moreover, Petitioner has not shown an "'overwhelming probability'" that the jury was not able to follow the trial court's instructions. *Richardson*, 481 U.S. at 208. On the contrary, the California Court of Appeal reasonably found that "despite the prosecutor's reliance on 42 distinct blows as reflecting premeditation and deliberation, [the jury's verdict of acquittal on first degree murder] suggests that the jury was . . . unimpressed by the prosecutor's interpretation of Jorden's actual testimony." *Law*, 2022 WL 3210088, at \*7.

The state court's rejection of this claim was reasonable and is entitled to AEDPA deference. *See* 28 U.S.C. § 2254(d). This claim is therefore DENIED.

### 3.     Legal Effect of Alleged Attempts to Conceal Evidence

Petitioner alleges that the prosecutor misstated the law and CALCRIM No. 371 regarding the legal effect of evidence showing that Petitioner tried to hide evidence of the crime, thus undercutting his defense. ECF No. 1 at 34-35. The claim is based on the following exchange:

> [PROSECUTOR:] The law says if you find the defendant suppressed evidence, what does that mean? Means he's guilty of the crime. Law says –
>
> [DEFENSE COUNSEL:] Objection. Improper statement of the law.
>
> THE COURT: Overruled.
>
> [PROSECUTOR:] The law says consider motive and you can't make up self-defense. You can't make it up. And that's what he tried to do. . . . If the defendant tried to hide evidence he was aware of his guilt. It's what [CALCRIM No.] 371 says. Washing the blood stains from the clothing, moving the murder weapon, leaving nothing in the trash. Come on. . . . Look at all garbage cans in his house. For someone who talks about eating and drinking and doing this, there's nothing in his garbage cans. Could that possibly be why it was 14 hours after the killing, after the laundry was done, after all of the other evidence had been stored and stashed. This is the evidence. Consciousness of guilt. If he made false or misleading statements to the police, determine that, use that to show he was guilty."

ECF No. 18-4 at 57-58.

United States District Court
Northern District of California

### a.    State Court Opinion

The California Court of Appeal found that the prosecutor's remarks constituted a misstatement of the law, but concluded that any error was harmless and did not require reversal.

> [Petitioner] argues that because the prosecutor offered an incorrect statement of the law and the trial court overruled the defense objection, there is a reasonable likelihood that the jury applied the law as described by the prosecutor notwithstanding the proper jury instruction on the same point. We recognize that a trial court may exacerbate the prosecutor's misstatement of the law by overruling a defense objection. Taking the record and instructions as a whole, however, we find no reasonable likelihood that the jury understood or applied the law as incorrectly stated by the prosecutor.
>
> There is no dispute that the trial court properly instructed the jury, both orally before closing arguments and through written instructions provided to the jury for reference during deliberation. Among other things, the trial court directed the jury to follow its statements of the law and to disregard conflicting statements of the law provided by counsel, properly instructed the jury on the prosecution's burden of proof, and properly instructed the jury on the inferences that may be drawn from the suppression of evidence.
>
> The provision of proper oral and written instructions is significant. As the California Supreme Court has explained, "'[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' '[P]rosecutorial commentary should not be given undue weight in analyzing how a reasonable jury understood . . . instructions. Juries are warned in advance that counsel's remarks are mere argument, missteps can be challenged when they occur, and juries generally understand that counsel's assertions are the statements of advocates.'" . . . Given the trial court's correct instructions in this case both on CALCRIM No. 371 and the jury's obligation to follow the law as provided by the court, together with repeated reminders throughout the prosecutor's closing that his statements were argument only, we are not persuaded that the trial court's decision to overrule the defense objection, without explanation, would likely have been taken an implicit endorsement of the prosecutor's obvious misstatement in this case. The prosecutor's express reference to the correct instruction, albeit only after the defense objection, likewise tended to mitigate the risk that the jury construed or applied the misstatement in an objectionable fashion. Had the jury been inclined to credit the prosecutor's disputed statement of the law, reference to the instruction itself would have made plain that the prosecutor's error was precisely the type of potentially unreliable attorney argument the trial court had warned the jurors to disregard. Thus, were it not apparent from the court's instructions themselves that the jury should measure the accuracy of the prosecutor's arguments by their consistency with the court's instructions, the prosecutor made that point contemporaneously with his misstatement of the law.

14

> Even assuming a reasonable likelihood that the jury was misled by the prosecutor's misstatement of CALCRIM No. 371, reversal would not be warranted on this record, because "[i]t is not reasonably probable that a result more favorable to [Petitioner] would have been reached absent the misconduct or with a curative admonition." Even without the prosecutor's misstatement of CALCRIM No. 371, [Petitioner]'s claim of self-defense was undermined by his extensive statements to police, particularly his admissions that he may have gone "too far" and that Nguyen was no longer a threat to him when [Petitioner] was on top of him on the ground. [Petitioner]'s injuries were also minor, both considered alone and particularly in contrast with the grisly state of Nguyen's arm, face, head, and brain.

*Law*, 2022 WL 3210088, at *10-11 (citations omitted).

### b.    Analysis of Federal Claim

As noted, prosecutorial misconduct violates the Due Process Clause when it renders a trial "fundamentally unfair." *Darden,* 477 U.S. at 181. In order to warrant habeas relief, the prosecutorial misconduct must have had a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos,* 328 U.S. at 776. Here, it is undisputed that the prosecutor committed misconduct when he misstated the legal consequences of a finding that Petitioner attempted to conceal evidence. The only remaining question is whether the misconduct prejudiced Petitioner such that federal habeas relief is warranted. *See Law*, 2022 WL 3210088, at *10; *Darden*, 477 U.S. at 180-82.

It is well-established that a prosecutor's mischaracterization of a jury instruction is less likely to render a trial fundamentally unfair than if the trial court issues the instruction erroneously:

> [A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are not evidence, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law. Arguments of counsel which misstate the law are subject to objection and to correction by the court. This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court.

*Boyde v. California*, 494 U.S. 370, 384-85 (1989) (citations omitted); *see United States v. Guess,* 745 F.2d 1286, 1288 (9th Cir. 1984) ("Improprieties in counsel's arguments to the jury do not constitute reversible error unless they are so gross as probably to prejudice the defendant, and the prejudice has not been neutralized by the trial judge.") (citation modified); *Estelle v. McGuire*, 502

United States District Court
Northern District of California

15

U.S. 62, 71-72 (1991) (to obtain federal collateral relief for constitutional errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process).

Here, although the trial court erroneously overruled defense counsel's objection, it instructed the jury on the correct legal standard and instructed the jury to ignore conflicting statements of the law made by counsel. *See Law*, 2022 WL 3210088, at *10-11. Specifically, the trial court read CALCRIM No. 371 to the jury prior to closing argument: "'If the defendant tried to hide evidence, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance; however, *evidence of such an attempt cannot prove guilt by itself*.'" *Law*, 2022 WL 3210088, at *9 (emphasis added). In addition, following defense counsel's objection, the prosecutor immediately referenced the jury instruction in question. *Id.* at 11. Under these circumstances, the state appellate court's determination that there was no reasonable likelihood that the jury failed to follow the trial court's instructions or was misled by the prosecutor's argument is not objectively unreasonable. *Lingar v. Bowersox,* 176 F.3d 453, 460 (8th Cir. 1999) ("When counsel misstates the law, the misstatement is harmless error if the court properly instructs the jury on that point of law or instructs that the attorneys' statements and arguments are not evidence."); *see Barragan*, 871 F.3d at 709 (holding that jury instruction cautioning jury regarding counsel's arguments, along with substance of other instructions, were sufficient to neutralize harm from erroneous legal argument by prosecutor even if instruction did not immediately follow or mention prosecutor's challenged remarks); *Xotoy v. Covello*, No. 22-cv-09431-HDV (SK), 2025 WL 1709793, *6-7 (C.D. Cal. Jan. 27, 2025) (rejecting prosecutorial misconduct claim where prosecutor misstated law during closing but trial court correctly instructed jury on the same point of law).

In addition to considering whether a curative instruction was issued by the trial court, a district court may consider the following factors to determine whether prosecutorial misconduct had a substantial and injurious effect on the verdict: (1) the weight of evidence of guilt (*compare United States v. Young*, 470 U.S. 1, 19 (1985) (finding "overwhelming" evidence of guilt) *with United States v. Schuler*, 813 F.2d 978, 982 (9th Cir. 1987) (in light of prior hung jury and lack of

United States District Court
Northern District of California

curative instruction, new trial required after prosecutor's reference to defendant's courtroom demeanor)); (2) whether the misconduct was isolated or part of an ongoing pattern (*see Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987)); (3) whether the misconduct relates to a critical part of the case (*see Giglio v. United States*, 405 U.S. 150, 154 (1972) (failure to disclose information showing potential bias of witness especially significant because government's case rested on credibility of that witness)); and (4) whether a prosecutor's comment misstates or manipulates the evidence (*see Darden*, 477 U.S. at 182).

Although the issue is close, Petitioner has not shown the misconduct at issue had a substantial and injurious effect based on these factors.  The second, third, and fourth factors listed above appear to weigh in favor of Petitioner, given the other allegations of prosecutorial misconduct and the nature of the misstatement at issue, which essentially instructed the jury to find Petitioner guilty if they determined that he tried to hide evidence after the killing. Nevertheless, the state appellate court reasonably determined that the evidence of guilt was overwhelming such that the error was harmless even if the jury misunderstood the instruction.  *See Law*, 2022 WL 3210088, at *11; *see also Barragan*, 871 F.3d at 708 ("An important factor contributing to the prejudicial effect of improper statements is the strength of the case against the defendant." (citation modified)).  The evidence at trial showed that Petitioner was larger than Nguyen; Nguyen appeared weak the morning of his death (ECF No. 17-8 at 55); Petitioner had minor cuts and bruises after the incident while Nguyen suffered a broken arm, broken ribs, and was missing portions of his head and skull at the time of his autopsy (*Law*, 2022 WL 3210088, at *2); Petitioner told police that he did not run away from the fight because he "was going to hurt [Nguyen] like he hurt – tried to hurt [Petitioner]" (ECF No. 18 at 96), and that he hit Nguyen with a rock after he "got the edge" during the altercation (ECF No. 18-11 at 147).  Petitioner also waited several hours after the altercation – including following visits from Chau and Ho – before calling police to report the incident.  *Law*, 2022 WL 3210088, at *1.

Petitioner argues that the jury's 10-hour deliberations undercut an argument that the evidence was overwhelming; however, the length of the deliberations is not dispositive.  *See Hoover v. Newland*, 307 Fed. App'x 56, 57-58 (9th Cir. 2009) (reversing district court's finding of

*United States District Court*
*Northern District of California*

prejudice from instructional error despite lengthy jury deliberations where state court's finding that evidence was overwhelming was not contrary to or an unreasonable application of clearly established federal law).[1]  Crucially, despite the challenged statement by the prosecutor, the jury acquitted Petitioner of first degree murder, suggesting that jurors did not follow the prosecutor's erroneous instruction.  *See Law*, 2022 WL 3210088, *11 n.9 ("[Petitioner]'s acquittal on first degree murder is significant, because it was principally in support of an inference of premeditation and deliberation that the prosecutor argued [Petitioner]'s concealment of evidence was probative.  To the extent the jury found that [Petitioner] suppressed evidence, the partial acquittal undermines an inference that the jury applied the law as stated by the prosecutor to presume guilt."); *see Young*, 470 U.S. at 18 n.15 (partial acquittal "reinforces our conclusion that the prosecutor's remarks did not undermine the jury's ability to view the evidence independently and fairly"); *Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000) (prosecutor's misconduct during closing arguments did not violate due process where trial court properly instructed jury and evidence of guilt was overwhelming).

The state court's rejection of this claim was reasonable and is entitled to AEDPA deference.  *See* 28 U.S.C. § 2254(d).  This claim is DENIED.

### 4.     Improper Burden Shifting

Petitioner argues that the prosecutor shifted his burden of proof during closing argument, which undercut Petitioner's claim of imperfect self-defense.  ECF No. 1 at 35-38.  Specifically, during rebuttal, the prosecutor referred to defense counsel's statements regarding Petitioner's state of mind at the time of the killing due to "an incident five months ago or six months ago and the police never followed up, because [the perpetrator of that incident] was a Vietnamese guy and the victim [in Petitioner's trial] is a Vietnamese guy.  So in some way the [Petitioner] had a state of mind where he was so scared."  ECF No. 18-4 at 100.  The prosecutor then stated:

---

[1] Petitioner also argues in his petition that the jury asked two questions during deliberations, suggesting that he was prejudiced by the prosecutor's misconduct.  *See* ECF No. 1 at 44. However, he does not explain, and the Court was unable to determine from the record, the nature of the jury's questions or the trial court's responses.  During habeas review, a federal court may not speculate:  it must adhere to the factual record before the state court and may not grant relief unsupported by the record.  *See Richter*, 552 U.S. at 109.

United States District Court
Northern District of California

So with regards to . . . that Vietnamese person, this fight, the police were called.  The defense have the same subpoena power as the People.  If this was that big of a deal, if this was true, you would have heard from the police officer who took that report.  You didn't.  If it was true you would have heard from this gang of Vietnamese people that could have affected the defendant's state of mind[.]

### a.    State Court Opinion

On appeal, Petitioner argued that the statement wrongfully shifted the burden to the defense, and that the prosecutor's statements were improper in light of the fact that there was no evidence that a police officer ever took a report on the incident.  *Id.* at 172.  The California Court of Appeal rejected this argument as follows:

[Petitioner] argues that the prosecutor improperly urged the jury to discredit [Petitioner]'s statements regarding a prior assault he had experienced at his home on the ground that [Petitioner] had failed to call witnesses to corroborate [his] claim.  Specifically, during rebuttal, the prosecutor argued, in effect, that [Petitioner]'s claim that a Vietnamese man had once threatened him at his house with a gun would have been corroborated by testimony from the officer who prepared the resulting police report or a "gang of Vietnamese people" if the incident were in fact significant to [Petitioner]'s state of mind in beating Nguyen . . . .[5]

> [n.5:  Trial counsel objected twice on the ground that the prosecutor was "shifting the burden."  Although the trial court did not sustain either objection, the trial court directed the prosecutor to "move on" after the second objection.]

We conclude that the prosecutor's comments were within permissible bounds.

Because the prosecution bears the burden of proving every element of an offense beyond a reasonable doubt, a prosecutor may not suggest otherwise to the jury.  Nor may the prosecution misstate the law, such as by representing that the defendant has the burden of producing evidence to demonstrate a reasonable doubt.  But subject to these constraints, the prosecution may comment on the state of the evidence or upon the failure of the defense to introduce material evidence or call logical witnesses.

According to [Petitioner]'s reading of *Woods*, the prosecutor's reliance on [Petitioner]'s failure to call corroborating witnesses was tantamount to an argument that the prosecution's burden of proof could be satisfied by a defense failure to produce exonerating evidence.  *Woods*, however, is distinguishable.  There, defense counsel in closing argument sought to discredit a testifying policy officer based both on the officer's testimony and his actions, which counsel suggested were characteristic of "a 'cowboy cop.'"  In rebuttal, the prosecutor argued that the defense, in thus challenging the officer's veracity, was "obligated" to call witnesses to testify that

19

the officer did not do his job properly. The prosecution added that "'[i]f there was anything to show that [the officer] was a bad cop, that he did something that was misconduct or inappropriate or wrong in this day and age, you'd have heard about it. You'd have heard about it right from the witness stand.'" In reversing, the court reasoned that the statement that defense counsel had an "obligation" to present evidence was particularly "troubling" in that it "expressly and erroneously advised the jury that appellant bore some burden of proof or persuasion." But the court specifically distinguished the prosecutor's claim of obligation from "mere comment on the defense failure to present evidence of misconduct."

Here, the prosecutor made no such "express and erroneous" suggestion. Fundamentally, the prosecutor argued to the jury that they should not credit [Petitioner]'s self-serving statements regarding the impact of a past assault on his mental state because (1) the past events bore no connection to the events that transpired between [Petitioner] and Nguyen; and (2) [Petitioner] did not corroborate his statements by calling witnesses who could confirm the underlying facts. The basic logic of the prosecutor's comments – that if [Petitioner]'s contention were true, [Petitioner] would have called witnesses who could have corroborated the contention – is consistent with cases concluding there was no prosecutorial misconduct. There is a material difference between arguing that the jury should choose to reject a contention because it is not corroborated by testimony from logical witnesses other than the defendant and arguing that the jury cannot accept a contention because the defendant had an obligation to put on evidence. . . . "A distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove her innocence"[.])[6]

> [n.6: To the extent [Petitioner] suggests that this distinction is "unduly formalistic," his preferred rule would seem to be that the prosecution may never argue for a favorable inference based on the defense's failure to call logical witnesses or present available material evidence. But, as [Petitioner] himself recognizes in his opening brief, the prosecution is permitted to do so. . . .]

*Law*, 2022 WL 3210088, at *8 & nn.5-6 (citations omitted).

The state appellate court also noted that while the prosecutor's statements about the defense being able to call members of a Vietnamese gang as witnesses were inappropriate and "fanciful," the prosecutor's argument overall amounted to a comment on the state of the evidence and the defense's failure to call logical witnesses given the evidence at trial that the police had prepared a report about the incident referenced by him during his police interview.

> [Petitioner] told the officers investigating Nguyen's death that he called the police after a man came to his house with a gun, and one of these officers testified that he "did pull the report" about the incident

20

but concluded there was "no connection between" the prior incident and [Petitioner]'s altercation with Nguyen.  Thus, the record plainly refutes [Petitioner]'s appellate contention:  there was a police officer who took [Petitioner]'s report about the incident and could have been called to corroborate the filing or contents of the report.

*Law*, 2022 WL 3210088, at *9.

### b.    Analysis of Federal Claim

Petitioner has not shown he is entitled to federal habeas relief for this claim.  "Criticism of defense theories and tactics is a proper subject of closing argument."  *United States v. Kessi*, 868 F.2d 1097, 1106 (9th Cir. 1989).  Accordingly, a prosecutor may properly comment upon a defendant's failure to present exculpatory evidence so long as the commentary does not implicate a defendant's own failure to testify.  *See United States v. Mares*, 940 F.2d 455, 461 (9th Cir. 1991); *United States v. Castillo*, 866 F.2d 1071, 1083 (9th Cir. 1988).  Additionally, a prosecutor may not argue that a defendant's "failure to adequately explain uncomfortable facts and inferences *require[s]* a guilty verdict."  *Mares*, 940 F.2d at 461 (emphasis added).

Here, the California Court of Appeal's determination that the prosecutor's statements amounted to permissible comments on the state of the evidence was not objectively unreasonable. *See Law*, 2022 WL 3210088, at *8-9; *see also Mares*, 940 F.2d at 461 ("It is a common practice for one side to challenge the other to explain to the jury uncomfortable facts and inferences.  The prosecutor did not argue that a failure to explain them adequately required a guilty verdict[.]").  The challenged comments did not state that Petitioner was obligated to produce evidence to prove his innocence, that the jury was required to find Petitioner guilty because he failed to do so, or otherwise implicate Petitioner's right not to testify.  Rather, the prosecutor's comments were similar to those found permissible in other cases.  *See Mares*, 940 F.2d at 461 (rejecting prosecutorial misconduct claim challenging prosecutor's statement that jury should consider whether the defense credibly explained why defendant was in restaurant parking lot with a drug dealer, and why they drove around the parking lot several times without purchasing food, in a drug purchase case); *see also United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir. 2000) (prosecutor did not shift burden of proof by commenting on defendant's failure to call wife and friend to corroborate his defense where prosecutor's argument did not implicate defendant's

failure to testify and jurors were reminded that prosecution had burden of proof); *Jones v. Moss*, No. 18-cv-05698-BLF, 2020 WL 1031888, *34-38 (N.D. Cal. Mar. 3, 2020) (prosecutor's statements arguing that "if the defendant claims that he acted in self-defense . . . and there were witnesses to testify to those observations, they would be here to testify" were permissible and not prejudicial based on proper jury instruction and strong evidence of guilt).

In addition, the California Court of Appeal's determination that the prosecutor's statements did not prejudice Petitioner was not objectively unreasonable. *See Law*, 2022 WL 3210088, at *9; 28 U.S.C. § 2254(d). It is undisputed that the jury was properly instructed as to burden of proof prior to closing arguments. *See Law*, 2022 WL 3210088, at *9; *Tan*, 413 F.3d at 115. Although the trial court did not re-instruct the jury following the prosecutor's argument, defense counsel extensively explained CALCRIM No. 220 during her closing argument and described the burden of proof for Petitioner's self-defense claim, noting:

> [T]he burden of proof in [self-defense] – and I bring this up because sometimes people think, well, he didn't prove that he . . . was using self defense . . . , he didn't prove that. But that's not what the law says. The law says that the People, the District Attorney[,] has the burden of proving beyond a reasonable doubt that the killing was not justified. So if there's a reasonable interpretation that it was, then the [District Attorney] hasn't proven it to you beyond a reasonable doubt. *So we don't have to prove that [Petitioner] used self-defense, although I think he did. The [District Attorney] has to prove to you that he didn't. And he has to prove that to you beyond a reasonable doubt.*

ECF No. 18-4 at 67 (emphasis added).

Under these circumstances, the state appellate court's rejection of this claim was reasonable and is entitled to AEDPA deference. *See* 28 U.S.C. § 2254(d). This claim is therefore DENIED.

### B.   *Brady v. Maryland*

Petitioner argues that the prosecution violated *Brady* by failing to provide the defense with a 2012 internal memorandum, written by a supervising attorney at the Santa Clara County District Attorney's Office, who described a meeting with Jorden concerning investigators that had questioned her autopsy findings in a previous homicide case involving the death of a toddler. According to the author, Jorden "expressed frustration" and "'remain[ed] angry with the

United States District Court
Northern District of California

United States District Court
Northern District of California

investigators for their reluctance to accept her initial opinion without question[.]'" ECF No. 1 at 45. Jorden reportedly "'stressed that she sees herself as an advocate for victims and could not understand why the investigators would allow a child molester to remain free.'" *Id.* Petitioner contends that the memorandum was material because defense counsel could have used it to cast doubt on Jorden's characterizations of the injuries on Nguyen's body and supported an argument that the investigation of the incident was biased against Petitioner. *Id.* at 48.

### 1.    State Court Opinion

The California Court of Appeal addressed the claim as follows:

> [Petitioner] argues that the prosecution violated his right to due process of law under [*Brady*] . . . by failing to timely disclose the Jorden Memo.    We conclude that the prosecution's untimely disclosure did not violate [Petitioner]'s constitutional rights because the memo was not material on the specific circumstances of this case. . . .

> In the trial court, [Petitioner] argued that timely disclosure of the Jorden Memo would have enabled him to impeach Jorden by showing that she was biased in favor of conviction.    On appeal, [Petitioner] adds that he would have used the Jorden Memo to impeach the entire prosecution team on the ground that Jorden's viewpoints were symptomatic of "systemic bias against criminal defendants in general[.]"    Although we agree that the Jorden Memo was favorable to the defense and could have been used to impeach Jorden, we conclude that – on this record – there is no reasonable probability that [Petitioner] would have received a different verdict with the benefit of the undisclosed evidence or an investigation flowing therefrom.    It was therefore not material.

> As a threshold matter, the issue on which Jorden testified – the cause and manner of death – was uncontested.    In her opening statement, defense counsel told the jury that "cause of death isn't disputed." Likewise, in closing argument, defense counsel reiterated: "I told you at the very beginning, he killed him by hitting him in the head."    The record of [Petitioner]'s confession over the course of three interviews with law enforcement left him no viable alternative to conceding the cause of death.    Irrespective of bias, then, [Petitioner] could not credibly contest Jorden's opinion that that Nguyen died as a result of "cranial cerebral injuries due to multiple blunt head trauma."

> [Petitioner] argues that even though Jorden's ultimate opinion was uncontested, Jorden gave damaging testimony regarding the number of injuries Nguyen suffered.    Specifically, [Petitioner] argues that he would have challenged Jorden's testimony that Nguyen suffered 42 separate injuries and 17 blunt force traumas to the head.    But Jorden's account of Nguyen's injuries was corroborated at trial by X-ray images of his broken skull and orbital bone, by graphic photos of Nguyen's body, and by the arguable presence of Nguyen's brain

23

matter on the bloody brick, the fence, and the "chunk" of bloody matter on [Petitioner]'s face when Ho first saw him. The acuity and extremity of the injuries Nguyen suffered was therefore not reasonably in dispute.

Even if impeaching Jorden would have permitted the defense to call into question the reliability of Jorden's count of blunt force traumas, the vividly documented state of Nguyen's head and evidence suggesting the presence of his brain matter on the fence, rock, and brick – particularly in combination with [Petitioner]'s equivocation about how Nguyen had struck him and whether [Petitioner] continued to be fearful once he was on top of Nguyen – leaves us no reasonable likelihood that the mere numerical tally of Nguyen's injuries would have lent weight to [Petitioner]'s claim of self-defense. The theory of self-defense was further undermined by Ho's testimony that it was because Nguyen had seemed unwell that she was anxious to locate him, and by [Petitioner]'s size advantage over Nguyen.

Moreover, [Petitioner]'s defense relied heavily on crediting rather than impeaching Jorden's testimony to counter the prosecution's theory of premeditation and deliberation necessary for first degree murder. In closing argument, defense counsel invoked Jorden by name no fewer than four times to challenge the prosecution's arguments. In particular, Jorden's testimony was critical to rebut the prosecutor's contention that the sheer number of injuries reflected so many blows that the jury should find that [Petitioner] acted with premeditation and deliberation. Accordingly, defense counsel argued, "Dr. Jorden is a very well-educated doctor. She's done, I think, 3,500 autopsies. . . . [¶] I'm going to take you back to the circumstantial evidence instruction. This is a great example." To mitigate Willis's testimony that some of the blood stains came from expired blood, defense counsel argued that Jorden's testimony made this unremarkable for a blow to the face. Although Jorden was a prosecution witness, a successful defense effort to discredit her would likely have been a pyrrhic victory at best: the uncontroverted physical evidence, [Petitioner]'s admission that he "maybe went too far," and the narrow disputed issues of mental state and justification left little to be gained by discrediting her, and potentially much to be lost as to the prosecution's theory of first degree murder.

As for [Petitioner]'s latest theory that the Jorden Memo would have allowed him to impeach other prosecution witnesses, there is no reasonable probability that [Petitioner] would have received a different verdict under such a theory of relevance. [Petitioner] proffers no theory by which the Jorden Memo – if admissible – could have furthered his effort to demonstrate bias by anyone other than Jorden. Jorden's bias has no tendency to prove or disprove, or suggest the existence of evidence proving or disproving, that any other prosecution witness or member of the prosecution was biased against [Petitioner], or criminal defendants generally. To the contrary, the fact and tenor of the memo suggest that the author himself – indisputably a member of the District Attorney's Office – harbored significant concerns about Dr. Jorden's bias and professionalism, saw fit to document those concerns as reflected in multiple cases, and bring those concerns to the District Attorney himself.[10]

[n.10:  The prosecution argued in the trial court that it had no obligation to disclose the memo at all.  We caution that our case-specific holding here is not an endorsement of that assertion.]

Although these concerns beg the question why the Jorden Memo had not been more widely disseminated within the office in the seven years separating its transmission to the District Attorney and [Petitioner]'s trial, they do nothing to impeach the credibility of the specific law enforcement witnesses who testified at [Petitioner]'s trial.

*Law*, 2022 WL 3210088, at *12-13 (citations omitted).

### 2.    Analysis of Federal Claim

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  For a *Brady* claim to succeed, (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) that evidence must have been suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice must have ensued.[2] *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *United States v. Bagley*, 473 U.S. 667, 676 (1985).

Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009).  "A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." *Smith v. Cain*, 565 U.S. 73, 74 (2012) (citation modified).  "[E]vidence impeaching [a witness] may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *Smith*, 565 U.S. at 76-77 (finding impeachment evidence of prosecution's sole witness material); *accord United States v. Agurs*, 427 U.S. 97, 112-13 & n.21 (1976).

Because Respondent does not dispute that the memorandum was favorable to Petitioner or that the evidence was suppressed until after the jury rendered its guilty verdict, the only factor at

---

[2] For the purpose of *Brady*, the terms "material" and "prejudicial" have the same meaning. *United States v. Kohring*, 637 F.3d 895, 902 n.1 (9th Cir. 2011).

25

issue is whether Petitioner showed materiality. *See* ECF No. 16 at 38. Based on the record, the state appellate court's determination in the negative was not objectively unreasonable. *Law*, 2022 WL 3210088, at *12-13. Petitioner argues that the evidence of Jorden's bias was material because it would have weakened her testimony regarding the number of injuries on Nguyen's body. *See* ECF No. 1 at 48-52. Petitioner does not explain how Jorden's potential bias would have meaningfully impacted her substantive testimony given that Nguyen's cause of death was undisputed. *Law*, 2022 WL 3210088, at *12. As to the extent of the injuries, the number and severity of Nguyen's injuries was not just based on Jorden's calculations, but also evident from the condition of Nguyen's body, as illustrated to the jury with graphic photos of his injuries, photos of the bloody crime scene, and x-rays of Nguyen's shattered skull and fractured arm. *Law*, 2022 WL 3210088, at *12; ECF No. 17-6 at 96-111. As further discussed by the state appellate court, despite any bias Jorden may have harbored, defense counsel used Jorden's testimony that a single strike could create multiple injuries to bolster Petitioner's claim that he only struck Nguyen with the rock three times. *Law*, 2022 WL 3210088, at *12-13. Accordingly, the California Court of Appeal's determination that the evidence was not material under *Brady* was not objectively unreasonable. *See Sivak v. Hardison*, 658 F.3d 898, 912 (9th Cir. 2011) (holding that evidence discrediting a witness's credibility was not material where, even if the impeachment evidence had been admitted, "the total mix of evidence would have been essentially unchanged."); *Reis-Campos v. Biter*, 832 F.3d 968, 975-76 (9th Cir. 2016) (holding that undisclosed evidence that could have impeached police officer's testimony about whether murder was gang-related was not material where impeachment value was limited based on other evidence).

In addition, to the extent Petitioner alleges that the evidence of Jorden's bias would have bolstered defense counsel's argument that the law enforcement investigation was biased against Petitioner, the petition largely cites to testimony by a different witness, Willis, the prosecution's crime scene reconstruction expert. *See* ECF No. 1 at 50-51; ECF No. 18-1 at 36. The state court reasonably determined that "Jorden's bias has no tendency to prove or disprove, or suggest the existence of evidence proving or disproving, that any other prosecution witness or member of the prosecution was biased against [Petitioner], or criminal defendants generally." *Law*, 2022 WL

26

3210088, at *13.  Given that this asserted theory of relevance is tenuous, the state court's determination of immateriality was reasonable.

The state court's rejection of this claim was reasonable and is entitled to AEDPA deference.  *See* 28 U.S.C. § 2254(d).  This claim is therefore DENIED.

### C.     Cumulative Prejudice

Petitioner argues that the various errors noted above caused cumulative prejudice to his defense.  ECF No. 1 at 52.  Specifically, Petitioner asserts that "the prosecutor's closing argument misstated the evidence, mischaracterized the law, and attempted to shift the burden of proof to the defense in a manner that combined to unfairly undermine [his] full self-defense, and [prevented] the jury from finding him guilty of the lesser offense of voluntary manslaughter, based either on imperfect self-defense or provocation/sudden quarrel."  *Id.*

#### 1.     State Court Opinion

The California Court of Appeal denied Petitioner's claim of cumulative prejudice as follows:

> [Petitioner] has identified two instances of prosecutorial overreach during his closing arguments:  the prosecutor implicitly argued an implausible inference from Jorden's testimony – that 42 blunt force traumas equated to 42 blows – and then misstated the legal effect of a potential finding that [Petitioner] attempted to clean up the scene. These two discrete but improper comments reflect isolated portions of the prosecutor's lengthy argument rather than a systematic effort to mislead the jury or a pattern of misconduct that has a tendency to build on itself.  Had there been any cumulative impact of the prosecutor's implausible inference from Jorden's testimony and his misstatement of the law, we conclude the impact would have tended to undermine the prosecutor's credibility rather than [Petitioner's] defense.
>
> We are likewise unable to fathom a means by which the untimely disclosure of the Jorden memo could plausibly amplify any prejudice from the prosecutor's remarks.  The defense election at trial to credit Jorden's testimony, specifically as a means of negating the prosecution theory of 42 separate blows, forecloses a determination that the two asserted errors cumulate rather than counteract.
>
> Considering all [Petitioner]'s claims of error, we conclude that there is no reasonable probability that the result of the proceedings would have been more favorable to [Petitioner] in the absence of the improper comments together with earlier disclosure of the Jorden Memo.

*See Law*, 2022 WL 3210088 at *13-14.

27

### 2.    Analysis of Federal Claim

The Supreme Court has held that a state court can violate due process through the combined effect of multiple erroneous rulings.  *See Chambers v. Mississippi,* 410 U.S. 284, 290 n.3 (1973), *Taylor,* 436 U.S. at 487-88 n.15.  To warrant relief, the flaws cumulatively must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974).  In other words, the cumulative impact of the errors must have had a "substantial and injurious effect or influence" on the jury's verdict. *Brecht,* 507 U.S. at 637.  A court must grant habeas relief on a claim alleging cumulative prejudice "when the reviewing judge has such 'grave doubt' about the harmlessness of the error that '[s]he feels . . . in virtual equipoise' on that issue."  *Parle v. Runnels*, 448 F. Supp. 2d 1158, 1161-62 (N.D. Cal. 2006), *aff'd,* 505 F.3d 922 (9th Cir. 2007) (citing *O'Neal v. McAninch,* 513 U.S. 432, 434-35 (1995)).  However, where no single constitutional error exists, nothing can accumulate to the level of a constitutional violation.  *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011); *Demetrulias v. Davis*, 14 F.4th 898, 916 (2021).

Here, although the issue is close as to the claim that the prosecutor misstated the legal effect of a finding that Petitioner attempted to clean up the scene, neither the California Court of Appeal nor this Court have determined that the error rose to the level of a constitutional violation. *See Law*, 2022 WL 3210088, at *13-14.  Even if an error of constitutional magnitude had occurred, the state appellate court's conclusion that there "is no reasonable probability that the result of the proceeding" would have been different was not objectively unreasonable.  *Id.* at *14; *see* 28 U.S.C. § 2254(d).  The Court acknowledges that both the challenged comments went to the key issue at trial, *i.e.*, Petitioner's state of mind.  However, as the California Court of Appeal noted, the jury apparently rejected the prosecutor's assertions that Petitioner struck Nguyen 42 separate times and that Petitioner was aware of his guilt based on his attempt to clean up the scene when it acquitted him of first-degree murder.  *Law*, 2022 WL 3210088 at *7, *11.  As to the Jorden memo, the appellate court reasonably concluded that impeachment evidence would likely have counteracted, rather than amplified, any prejudice from the prosecutor's argument that the evidence showed 42 separate blows.  *See Law*, 2022 WL 3210088 at *13-14.

28

Under these circumstances, the state appellate court could reasonably deny Petitioner's claim of cumulative error. *See Macias v. Farmon*, 77 Fed. App'x 924, 925 (9th Cir. 2009) (rejecting claim of cumulative error where petitioner "ha[d] not shown that the cumulative prejudicial effect of the alleged errors puts the case in such a different light as to undermine confidence in its outcome"); *cf. United States v. Preston*, 873 F.3d 829, 835 (9th Cir. 2017) (reversing conviction for aggravated sexual abuse where multiple errors unfairly bolstered the victim's credibility, defendant was portrayed as the "type of person" who would molest a child, and the government's case hinged entirely on the victim's credibility with little corroborative evidence).

Accordingly, the state court's rejection of this claim was reasonable and is entitled to AEDPA deference. *See* 28 U.S.C. § 2254(d). This claim is therefore DENIED.

### D.      Motions to Supplement Record

Petitioner filed multiple motions to supplement his habeas petition's exhibits. *See* ECF Nos. 28, 31, 32. Respondent filed an opposition. *See* ECF No. 29.

As noted, Petitioner appended to his motion a copy of report summarizing the interview by the Alternative Public Defender Office's investigator of Pham, who was arrested after brandishing a gun at Petitioner. *See* ECF No. 28-1 at 15-18. Petitioner also provides a copy of a habeas petition filed in Santa Clara County Superior Court raising claims that the prosecutor committed misconduct and violated his due process rights by misstating CALCRIM No. 371, mischaracterizing material evidence, and shifting the burden of proof to the defense to produce evidence that he was attacked by Pham. *Id.* at 21. In addition, Petitioner provides copies of the Superior Court order denying his claims on the following bases: (1) the claims were procedurally barred because they were or could have been raised on appeal, (2) the Alternate Defender's Office report was not presented to the jury, thus jurors would not have seen any false statements contained in the report, and (3) the evidence in the report was otherwise cumulative of other evidence in the appellate record concerning whether Petitioner filed a police report about the incident involving Pham. ECF No. 31 at 8-11. Petitioner concedes in his filings that the Alternative Public Defender's Officer report is not new. *See* ECF No. 28 at 2.

United States District Court
Northern District of California

The filings do not clarify whether Petitioner is attempting to bolster his pending claims or raise a new claim of prosecutorial misconduct based on the report. To the extent that Petitioner is attempting to bolster his pending claims, the Court notes that federal habeas courts are bound by principles of comity and finality, and generally may not take new evidence on federal habeas review. As explained by the United State Supreme Court in *Shinn v. Ramirez*, 596 U.S. 366 (2022):

> Section 2254(e)(2) provides that, if a prisoner "has failed to develop the factual basis of a claim in State court proceedings," a federal court may hold "an evidentiary hearing on the claim" in only two limited scenarios. Either the claim must rely on (1) a "new" and "previously unavailable" "rule of constitutional law" made retroactively applicable by this Court, or (2) "a factual predicate that could not have been previously discovered through the exercise of due diligence." §§ 2254(e)(2)(A)(i), (ii). If a prisoner can satisfy either of these exceptions, he also must show that further factfinding would demonstrate, "by clear and convincing evidence," that "no reasonable factfinder" would have convicted him of the crime charged. § 2254(e)(2)(B). Finally, even if all of these requirements are satisfied, a federal habeas court still is not *required* to hold a hearing or take any evidence. Like the decision to grant habeas relief itself, the decision to permit new evidence must be informed by principles of comity and finality that govern every federal habeas case.

*Id.* at 381-82.

Petitioner has not made the required showing to allow this Court to consider new evidence. *Id.* Crucially, Petitioner concedes that the evidence is not new and does not explain why the evidence was not previously presented to the state courts. *See* ECF No. 28 at 2. Moreover, he has not shown any meaningful probability, let alone "clear and convincing evidence," that "but for [the] constitutional error, no reasonable factfinder would have found the [petitioner] guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B) (emphasis added). As noted by the Santa Clara County Superior Court in the appended order, the report was not shown to the jury such that they would have seen any allegedly false statements contained therein. *See* ECF No. 32 at 6-7, n.1. To the extent Petitioner alleges some portions of the report should have been shown to the jury, the Court agrees with the Superior Court's conclusion that the evidence was cumulative of other evidence in the trial record. *Id*.; *see Crisp v. Covello*, No. 19-16987, 2023 WL 154949, *2 (9th Cir. 2023) (upholding decision denying evidentiary hearing where "the state record contained

United States District Court
Northern District of California

sufficient facts to adjudicate [the petitioner's] petition.").

Petitioner's motions to supplement the exhibits to his habeas petition are DENIED. *See* ECF Nos. 28, 31, 32.

## IV.   CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard, *id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Although the Court determined that the state appellate court reasonably rejected Petitioner's habeas claims, the prosecutorial misconduct claim related to the prosecutor's misstatement of CALCRIM No. 371 and, by extension, Petitioner's claim of cumulative error involve a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The constitutional issues in both claims are close based on the circumstances, and the Court therefore concludes that reasonable jurists may disagree with the Court's assessment. Accordingly, the Court GRANTS a Certificate of Appealability as to those claims.

## V.   CONCLUSION

The Court orders as follows:

1. The petition for writ of habeas corpus is DENIED.

2. The motions to supplement the habeas petition are DENIED. *See* ECF Nos. 28, 31, 32.

3. The Court GRANTS a Certificate of Appealability as to the claims that the prosecutor committed misconduct by misstating the legal effect of a finding that

31

Petitioner attempted to clean up the scene or hide evidence and Petitioner's claim of cumulative error.

4. The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated:   March 20, 2026

_____
Eumi K. Lee
United States District Judge

United States District Court
Northern District of California

32